***E-FILED - 9/30/10***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DESHAWN LEE CAMPBELL, | ) | No. C 05-3563 RMW (PR) |
| Petitioner, | ) ) | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; |
| vs. | ) ) | DENYING CERTIFICATE OF APPEALABILITY |
| MATTHEW CATE, Secretary of Dept. of Corrections and Rehabilitation, | ) ) ) | |
| Respondent. | ) ) | |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner filed the petition along with an ex parte motion to stay and hold the petition in abeyance so that he could exhaust additional claims in state court. The court granted petitioner's motion. After petitioner had exhausted his claims in state court, the court re-opened the instant action and ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and a supporting memorandum of points and authorities addressing the merits of the petition. Although given an opportunity, petitioner did not file a traverse. Having reviewed the papers and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief and will deny the petition.

**FACTUAL BACKGROUND**

On June 22, 2001, petitioner entered a Good Guys home electronics store and attempted

to use a stolen credit card and driver's license to purchase a television. (RT 375.) After the salesperson noticed something wrong with the credit card, the store manager called the police. (Id. at 378.) Sergeants Wilson and Spagnoli responded to the call and approached petitioner inside the store. (Id. at 275-78, 383.) When the officers attempted to conduct a pat-down search, petitioner started running. (Id. at 281-83.) Petitioner circled around the store and then ran for the exit which Sergeant Wilson had blocked. (Id.) Seeing that he was trapped, petitioner attempted to run straight through Sergeant Wilson who grabbed petitioner and the two men fell through the doorway to the sidewalk outside. (Id. at 286.) Petitioner began "swinging his arms, kicking   and . . . screaming" in an effort to free himself from Sergeant Wilson's grasp. (Id. at 286-87.) Petitioner managed to get to his feet and Sergeant Wilson performed a "leg sweep" to bring petitioner back to the ground. (Id. at 287.) The maneuver caused Sergeant Spagnoli, who had petitioner in a head lock at the time, to fall to the sidewalk hitting his head and elbow. (Id. at 310.) Petitioner continued to kick wildly and knocked Sergeant Wilson to the ground, who injured his knee and left elbow in the fall. (Id.)

Officer Kendall arrived at the scene as the two other officers struggled to detain petitioner. Petitioner made it to his feet for a second time and Officer Kendall immediately tackled him and forced him to the ground. (Id. at 435.) In the process, Officer Kendall injured his left knee. (Id. at 436, 440.) Eventually, the officers handcuffed petitioner who continued to kick and scream. (Id. at 292-93.)

All three officers were transported to the hospital and were examined. Sergeant Wilson suffered skinned knees and his left elbow was skinned and swollen. (Id. at 310.) He missed three days of work as a result. (Id. at 291.) Sergeant Wilson missed one day of work and Officer Kendall missed two days as a result of their injuries. (Id. at 389, 436.)

In a separate incident on July 5, 2001, Victor Vargas pulled up to his restaurant, the Birrieria Tepa, with several boxes of goat meat in his truck. (RT 224.) While Vargas was unloading some of the boxes inside the restaurant, a waitress saw two men taking boxes from the truck. (Id. at 226, 478-79.) Vargas ran outside and discovered two boxes of meat missing. (Id. at 228-29.) He saw a man walking quickly away with a box of meat and he ran after the man.

1   (Id. at 229-230.) As Vargas began his pursuit he was knocked down from behind. (Id. at 230.)

2   James Johnson, who was standing around the corner from Vargas' restaurant drinking a
3   beer, testified that he noticed three African-American men walking near Vargas' restaurant prior
4   to the incident. (Id. at 132.) Amongst the three men Johnson recognized petitioner and Walter
5   Pennywell, who he knew from the neighborhood. (Id.) He then saw petitioner and an unknown
6   man[1] running past him each carrying a box of meat. (Id. at 135.) Johnson then saw Walter
7   Pennywell knock Vargas down as he pursued the men. (Id. at 138.) Petitioner, Pennywell and
8   the third man then ran towards a nearby alleyway. (Id. at 139.)

9   Moments after the incident Johnson recognized a blue Cadillac near the scene of the
10  crime. (Id.) When police arrived, Johnson told them that petitioner's father owned a similar
11  blue Cadillac and Johnson took the police to petitioner's father's house, where petitioner also
12  lived. (Id.) The next day, petitioner approached Vargas in front of his store and angrily
13  questioned him about why he had sent police to his house. (Id. at 226.) Vargas recognized
14  petitioner from the robbery the day before and as a result was able to identify him in court. (Id.
15  at 225.)

16  In early 2002, petitioner and codefendant Walter Pennywell were charged with second
17  degree robbery. (Id. at 201, 502.) Petitioner was also charged with attempting to use a
18  counterfeit access card, using a counterfeit access card with the intent to defraud, possession of a
19  forged driver's license, three counts of battery on a police officer and three counts of resisting
20  arrest stemming from the Good Guys incident. (CT 181-85.) The robbery and Good Guys
21  incidents were consolidated for trial and on May 2, 2002, a jury found petitioner and
22  codefendant Pennywell guilty on all counts. Petitioner was sentenced to an aggregate term of 19
23  years, eight months for all crimes and associated enhancements. (CT 418.)

24  Petitioner appealed and the California Court of Appeal affirmed the judgment on March
25  19, 2004. The California Supreme Court denied review on June 9, 2004. Petitioner filed a state
26  habeas petition on August 24, 2005. On September 2, 2005, petitioner filed the instant federal

27
28
[1] Marcus Glass later admitted to being the unidentified man.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.05\Campbell3563denyhc.wpd   3

1  action along with an ex parte motion to stay and hold the petition in abeyance so that he could
2  exhaust additional claims in state court. The state court denied petitioner's habeas petition on
3  March 28, 2008, the Court of Appeal denied review on July 11, 2008 and the California Supreme
4  Court denied review on September 10, 2008. On November, 7, 2008 this court re-opened the
5  instant action.

## LEGAL CLAIMS

Petitioner asserts the following claims for habeas relief: (1) there was insufficient evidence to support a conviction for robbery; (2) there was insufficient evidence to support petitioner's convictions for two counts of battery on a peace officer because injury "requiring professional medical treatment" was not supported by the evidence; (3) there was insufficient evidence to support a conviction of battery on a peace officer because petitioner did not personally inflict the injury; (4) newly discovered evidence exonerates petitioner; (5) counsel was ineffective for failing to uncover and present such exculpatory evidence; (6) counsel was ineffective for failing to investigate and present an alibi defense; (7) counsel was ineffective for failing to impeach a prosecution witness' ability to identify petitioner; and (8) false evidence was used to convict petitioner.

## DISCUSSION

**A.    Standard of Review**

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings. Under the AEDPA, a federal court may not grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.05\Campbell3563denyhc.wpd    4

law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" <u>Id.</u> at 409. In examining whether the state court decision was objectively unreasonable, the inquiry may require analysis of the state court's method as well as its result. <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003). The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B.      Petitioner's Claims**

       1.      <u>Insufficient evidence.</u>

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

1  a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional
2  claim, which, if proven, entitles him to federal habeas relief.  See Jackson v. Virginia, 443 U.S.
3  307, 321, 324 (1979).

4        A federal court reviewing collaterally a state court conviction does not determine whether
5  it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982
6  F.2d 335, 338 (9th Cir. 1992).  Rather, the federal court "determines only whether, 'after
7  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact
8  could have found the essential elements of the crime beyond a reasonable doubt.'"  See id.
9  (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of
10 guilt beyond a reasonable doubt, may the writ be granted.  See Jackson, 443 U.S. at 324.

11       A federal habeas court must apply the Jackson standard with an additional layer of
12 deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal habeas
13 court must ask whether the operative state court decision reflected an unreasonable application
14 of Jackson to the facts of the case.  Id. at 1275 (quoting 28 U.S.C. § 2254(d)).  Thus, if the state
15 court affirms a conviction under Jackson, the federal court must decide whether the state court's
16 application of Jackson was objectively unreasonable.  See McDaniel v. Brown, 130 S. Ct. 665,
17 673 (2010).

18       a.    <u>Lack of evidence to support petitioner's robbery conviction.</u>

19       Petitioner alleges there was insufficient evidence to support his robbery conviction on
20 either an aiding and abetting or conspiracy theory.  (Pet. at 6a.)  While petitioner does not
21 dispute the evidence shows he took part in the theft of Vargas' meat, he argues that Pennywell's
22 act of knocking Vargas to the ground was not a natural and probable consequence of this theft.
23 (Id. at 6d.)

24       Petitioner claims he neither knowingly nor intentionally aided or abetted Pennywell in his
25 act of knocking Vargas to the ground.  (Pet. at 6c.)  According to petitioner, Pennywell acted
26 independently in his use of force and there is no evidence that petitioner "asked or signaled
27 Pennywell" or that "petitioner aided Pennywell in any way to apply force."  (Id. at 6d.)
28 Likewise, petitioner argues that there was insufficient evidence to support a conviction of

conspiracy to commit robbery because Pennywell's act was not a natural and probable consequence of the alleged agreement to commit theft and there was no evidence indicating that petitioner was aware that Pennywell would use force. (Id.)

At trial, the prosecution presented two alternative theories of petitioner's liability for robbery: conspiracy and aiding and abetting. (RT 559.) According to Johnson, petitioner and an unidentified man took boxes of meat from Vargas' truck and as Vargas chased them down the street he was knocked down from behind by Pennywell. (RT 138.) The three men then ran down an alleyway near an apartment building. (RT 139.)

In rejecting petitioner's claim, the Court of Appeal ruled that there was sufficient evidence to convict petitioner of robbery on either a theory of aiding and abetting or conspiracy to commit robbery. (Resp. Ex. 7 at 10-11.) The court emphasized that Pennywell's use of force was a foreseeable consequence of petitioner's plan to steal the meat. (Id.)

California law defines robbery as " the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211. Under state law, an individual who participates in a crime may be liable "not only for the crime he or she intended to aid and abet (the target crime) but also for any other crime that is the natural and probable consequence of the target crime." People v. Prettyman, 14 Cal. 4th 248, 259 (1996). Furthermore, an individual who agrees to commit a crime may be liable as a co-conspirator for the natural and probable consequences of any crime committed in furtherance of that target crime. People v. Medina, 46 Cal. 4th 913, 920 (2009).

Here, the Court of Appeal reasonably concluded that there was sufficient evidence to permit a jury to convict petitioner of robbery. At trial, Johnson testified that petitioner, Pennywell and a third man were together immediately before the incident. (RT 135.) Vargas testified that he noticed the three men standing on the corner near his restaurant as he drove up with several boxes of meat. (RT 224.) This evidence supports the inference that the three men knew each other and were together immediately prior to the crime. In light of Johnson's testimony that they stole the meat and fled the scene together, the jury may have reasonably

inferred that the three men had an agreement to commit theft and acted towards that end. While perhaps petitioner intended only the theft, it was certainly foreseeable that Vargas would attempt to thwart the theft and that the men would use force to escape from being apprehended.

Viewing the evidence in the light most favorable to the state, the jury had sufficient evidence to conclude that Pennywell's use of force was a natural and probable consequence of petitioner's plan to commit theft. Thus, the Court of Appeal's affirmation of petitioner's robbery conviction was not an unreasonable determination of facts, nor contrary to or an unreasonable application of federal law.

    b.  <u>Lack of evidence that officers suffered injury.</u>

Petitioner alleges his convictions for battery on a peace officer causing injury stemming from the Good Guys incident are not supported by the evidence. (Pet. at 6f.) Petitioner claims that while the evidence shows that Sergeants Wilson and Spagnoli received medical treatment there was no evidence that the injuries required such treatment. (<u>Id.</u>) Therefore, petitioner contends the evidence does not support his conviction within the meaning of the applicable penal code. (<u>Id.</u>)

At trial, Sergeant Wilson testified that after arriving at Good Guys, he and Sergeant Spagnoli approached petitioner and asked to "pat search him for weapons." (RT 281.) After petitioner objected to being searched, he took off running through the store. (<u>Id.</u> at 283.) The officers tackled petitioner who began swinging and kicking violently. (<u>Id.</u> at 287.) Officer Kendall arrived on the scene and assisted to subdue petitioner. (<u>Id.</u> at 290.)

Sergeant Wilson stated that in his attempt to detain petitioner he fell and landed on both his knees and left elbow. (<u>Id.</u> at 291.) As a result, his knees were skinned and his left elbow was skinned and swollen. (<u>Id.</u> at 310.) He was examined at a nearby emergency room and missed three days of work. (<u>Id.</u> at 291.) Sergeant Spagnoli testified that he was injured and transported to the hospital in an ambulance. (<u>Id.</u> at 389.) He received medical treatment and as a result of his injuries missed one day of work. (<u>Id.</u>)

The Court of Appeal concluded that the evidence was sufficient to show that the officers suffered injuries within the meaning of California Penal Code § 243. (Resp. Ex. 7 at 7.) The

1  court found that while the evidence was short of "compelling," the jury reasonably credited the
2  officers' statements as to their injuries and determined that they required professional medical
3  treatment. (Id.)

4  For purposes of California Penal Code § 243, injury is defined as "any physical injury
5  which requires professional medical treatment." Cal. Penal Code § 243(f)(5). The existence of
6  an injury depends on "the nature, extent, and seriousness of the injury-not the inclination or
7  disinclination of the victim to seek medical treatment." People v. Longoria, 34 Cal. App. 4th 12,
8  17 (1995). Thus, an officer who obtains medical treatment when none is required has not
9  suffered an injury under the statute. (Id.)

10  Affording the Court of Appeal the deference to which they are entitled, this court cannot
11  say a rational trier of fact could not have found the officer's injuries required professional
12  medical treatment. See Juan H., 408 F.3d at 1274. The evidence shows that Sergeant Wilson
13  sustained cuts to both knees and swelling to his left elbow. Sergeant Spagnoli struck his head
14  and left elbow on the concrete. Both officers received medical treatment after being transported
15  in ambulances to the hospital and missed work as a result of their injuries. Viewing this
16  evidence in the light most favorable to the prosecution, a rational trier of fact may have
17  concluded that the officer's injuries required professional medical treatment. Although the
18  record lacks any medical testimony as to the extent of the officers' injuries, both a swollen elbow
19  and blow to the head may be seen by a reasonable person as requiring professional medical
20  attention. Because the jury had a fair basis to conclude that the professional medical treatment
21  administered was in fact required, the Court of Appeal's affirmation of petitioner's conviction
22  was not an objectively unreasonable application of Jackson.

23  c.  Lack of evidence that petitioner personally inflicted injury.

24  Petitioner alleges that there is insufficient evidence to support his convictions for battery
25  on a peace officer causing injury because he did not personally inflict the injuries to Sergeant
26  Wilson and Sergeant Spagnoli. (Pet. at 6l.) Petitioner contends that Penal Code § 243 requires a
27  showing that the defendant inflicted the injuries directly. (Id.)

28  At trial, Sergeant Wilson testified that he was injured when he applied a leg sweep which

1 took both petitioner and Sergeant Spagnoli to the ground and that he did not receive any injuries from petitioner directly. (RT 312.) Sergeant Spagnoli also testified that the injuries he received were a result of the maneuver applied by Sergeant Wilson and not directly from petitioner. (RT 393-94.)

The Court of Appeal rejected petitioner's proposed interpretation of § 243 holding that the statute does not require a defendant to personally inflict an injury, but rather requires that he proximately cause the harm. (Resp. Ex. 7 at 8.) The court explained that if "the Legislature wished to define culpability for the harm in terms of a personal, direct infliction of injury, it knew how to do so." (Id.)

Here, petitioner has failed to state a claim warranting federal habeas relief. He argues that the Court of Appeal misinterpreted California Penal Code § 243, however, a state court's interpretation of state law binds a federal court on habeas review. Bradshaw v. Richey, 546 U.S. 74, 76 (2005). A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." Longford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996). Because petitioner offers no evidence that the California Supreme Court would agree with his proposed interpretation of the statute, his claim fails. Hicks v. Feiock, 485 U.S. 624, 630 n.3 (1988) (explaining that even a determination of state law made by an intermediate appellate court must be followed and may not be "disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise").

2.   Actual Innocence.

Petitioner claims that newly acquired testimony shows that he is actually innocent of his robbery conviction. (Pet. at 6n.) Petitioner has presented the declaration of Marcus Glass, who admitted to participating in the robbery, the testimony of his co-defendant Walter Pennywell, and the testimony of Edwin Lee Campbell, petitioner's brother. (Suppl. Decl., Ex. A-B.) All three men claim that it was Edwin Lee Campbell and not petitioner who committed the robbery. (Id. at 6o.)

The Santa Clara Superior Court held an evidentiary hearing to evaluate petitioner's newly discovered evidence. During the evidentiary hearing, Edwin Campbell testified that he went to

1  Vargas' restaurant to get meat for a barbeque on the day of the crime, and as he approached the
2  restaurant he noticed Vargas' truck and decided to steal the meat. (Ex. 12, Vol. 1 at 148- 49.)
3  Edwin testified that the box of meat he took was "kind of light" and that he was able to run with
4  the box with no difficulty. (Id. at 150.) To the contrary, at trial, Vargas testified that the thief
5  tried to run but "the box is heavy"and the thief had difficulty carrying it. (RT 232.) Edwin also
6  testified that the robbery took place in September or October of 2001, when in fact it occurred
7  July 5. (Ex. 12, Vol. 1 at 174.) Further, Edwin stated that he was willing to admit to being
8  involved in the crime only because the statute of limitations had run for the robbery. (Id. at 171.)
9  The state court found Edwin's testimony wholly incredible and concluded that he was attempting
10 to exonerate petitioner in light of the fact that Edwin faced no possibility of prosecution. (Ex. 10
11 at 15.)

12       Walter Pennywell testified at the evidentiary hearing that he participated in the robbery
13 with Edwin Campbell and Marcus Glass. (Id.) The court emphasized that this testimony
14 contradicted a previous statement to a probation officer where Pennywell maintained that he had
15 not been involved in the robbery. (RT 325, 326.) Thus, the state court found that Pennywell's
16 testimony lacked credibility as well. (Ex. 10 at 16.)

17       Additionally, petitioner presents the declarations of Marcus Glass and Jason Huffman
18 which have been submitted since the state court's evidentiary hearing. (Pet'r, Ex. A-C.) Glass
19 states that he, Pennywell, and Edwin Campbell participated in the theft of meat on July 5, 2001
20 and petitioner was neither present nor did he participate in any way. (Pet'r, Ex. A.) Glass claims
21 that after they stole the meat they ran to a nearby park to have a barbeque and Jason Huffman
22 met them there. (Id.) Huffman claims that while he does not recall the exact date, he remembers
23 meeting Edwin Campbell, Pennywell and Glass in the park for a barbeque. (Pet'r, Ex. C at 7.)
24 According to Huffman the men were talking about the fact that they had stolen some goat meat
25 earlier that day. (Id.)

26       "Claims of actual innocence based on newly discovered evidence have never been held to
27 state a ground for federal habeas relief absent an independent constitutional violation occurring
28 in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993). In

Herrera, the Supreme Court assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Herrera, 506 U.S. at 417. The Ninth Circuit has assumed without deciding that freestanding actual innocence claims are cognizable in federal habeas proceedings in both capital and non-capital cases. See Osborne v. District Attorney's Office, 521 F.3d 1118, 1130-31 (9th Cir. 2008), cert. granted, 129 S. Ct. 488 (U.S. Nov. 3, 2008). Actual innocence in this context means "factual innocence, not mere legal insufficiency." Jaramillo v. Stewart, 340 F.3d 877, 882 (9th Cir. 2003.) The petitioner's burden in such a case is "extraordinarily high," and requires a showing that is "truly persuasive." See id. (quoting Herrera, 506 U.S. at 400). A reviewing court must therefore determine whether "in light of the new evidence, no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 329 (1995).

Here, petitioner has failed to show that he is probably innocent of his robbery conviction. Petitioner's newly discovered evidence was heard and rejected by the state court. Credibility determinations ultimately rest with the state court judge, who in this case found the testimonies of both Edwin and Pennywell unbelievable. See Weaver v. Palmateer, 455 F.3d 958, 963 n.6 (9th Cir. 2006) (a state court's rejection of a claim following a hearing at which directly contradictory statements are offered is entitled to deference under § 2254(d)(2)). In the absence of clear error, this court defers to the state court's assessment.

In addition to the testimony presented at the evidentiary hearing, petitioner offers the declarations of Marcus Glass and Jason Huffman. Glass alleges that petitioner was never at the scene of the crime however, counsel for petitioner testified that Marcus Glass stated prior to the trial that petitioner was present at the scene of the crime but did not take any meat. (Resp. Ex. 12, Vol. 2 at 445.) This direct contradiction in Glass' testimony undercuts his credibility of the account. The declaration of Huffman, who does not claim to have witnessed the crime, is insufficient to redeem the plethora of inconsistencies among petitioner's alleged exculpatory witnesses. Petitioner has failed to present credible accounts of the robbery showing his

1  conviction to be wrongful and thus has fallen well short of his burden to demonstrate his
2  affirmative innocence.  Therefore, the state court's rejection of petitioner's actual innocence
3  claim was not an unreasonable determination of facts, nor contrary to or an unreasonable
4  application of clearly established federal law.
5         3.     <u>Ineffective assistance of trial counsel.</u>
6      In regards to his robbery conviction, petitioner claims that his trial counsel rendered
7  ineffective assistance in violation of his Sixth Amendment rights by failing to investigate and
8  present evidence of third party culpability and evidence of an alibi in connection with
9  petitioner's robbery conviction.  (Pet. at 6r-6z.)
10     The Sixth Amendment right to counsel guarantees not only assistance, but effective
11 assistance of counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  "The benchmark
12 for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the
13 proper functioning of the adversarial process that the trial cannot be relied upon as having
14 produced a just result."  <u>Id.</u>  In order to prevail on a Sixth Amendment ineffectiveness of counsel
15 claim, petitioner must establish two things.  First, he must establish that counsel's performance
16 was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing
17 professional norms.  <u>Id.</u> at 687-88.  Counsel's performance is presumed to fall "within a wide
18 range of reasonable representation."  <u>Hoffman v Arave</u>, 455 F.3d 926, 931 (9th Cir. 2006)
19 (quoting <u>United States v. Ferreira-Alameda</u>, 815 F.2d 1251, 1253 (9th Cir. 1987)).  Second,
20 petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that
21 "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the
22 proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  Petitioner must show that
23 counsel's errors were so serious as to render the results of the trial unreliable.  <u>Id.</u> at 688.
24     Counsel must, at a minimum, conduct a reasonable investigation enabling him to make
25 informed decisions about how best to represent his client.  <u>Avila v. Galaza</u>, 297 F.3d 911, 924
26 (9th Cir. 2002).  <u>Strickland</u> directs that "'a particular decision not to investigate must be directly
27 assessed for reasonableness in all the circumstances, applying a heavy measure of deference to
28 counsel's judgments.'"  <u>Silva v. Woodford</u>, 279 F.3d 825, 836 (9th Cir. 2002) (quoting

1  Strickland, 466 U.S. at 491).

2             a.    Failure to present evidence of third party culpability.

3  Petitioner claims that his trial counsel fell below an objective standard of reasonableness

4  by failing to investigate and present evidence of Edwin Lee Campbell's commission of the

5  crime. (Pet. at 6q.) However, as previously discussed, the state court reasonably determined that

6  the testimony presented by petitioner during the evidentiary hearing lacked credibility.

7  Furthermore, the additional declarations submitted by Glass and Huffman cannot be said to

8  reasonably undermine confidence in the outcome of petitioner's trial. Petitioner has failed show

9  that he was prejudiced by the failure of his trial counsel to present testimony as to Edwin's

10 culpability for the robbery. Strickland, 466 U.S. at 694. Thus, the state court's rejection of this

11 claim was not an unreasonable determination of facts, nor contrary to or an unreasonable

12 application of clearly established federal law.

13            b.    Failure to present alibi defense.

14 Petitioner alleges that testimony from his mother and father, Susan and Robert Campbell,

15 and a friend, Chonte Dillard, along with a bank receipt from the day of the robbery show that he

16 could not have committed the robbery. (Pet. at 6x.) According to petitioner, his trial counsel's

17 failure to present this evidence in connection with an alibi defense rendered him ineffective.

18 (Id.)

19 At the evidentiary hearing, Susan Campbell testified that on the morning of July 5, 2001,

20 the day of the robbery, she along with Chonte Dillard and Dillard's two children picked

21 petitioner up from his father's house at around 8:30 a.m.[2] (Resp. Ex. 12, Vol. 1 at 230.) They

22 drove to an appointment at a local paralegal office but arrived before it was open for business.

23 (Id.) They then drove to a nearby bank in order to withdraw cash to pay petitioner's bail

24 stemming from a previous charge. (Id. at 234.) A bank receipt confirms that $1,000 was

25 withdrawn from Susan Campbell's bank account on July 5, 2001 at 10:39 a.m. (Resp. Ex. 12,

26 Vol. 3 at 695.) Ms. Campbell then drove back to the paralegal's office where she gave the

27 money to petitioner and he walked to Bad Boys Bail Bonds to pay his bail. (Resp, Ex. 12, Vol.1

28

---

[2] The robbery occurred around 9:30 a.m. (RT 132.)

at 235.)

Chonte Dillard testified that she is a friend of Susan Campbell's and was with her on the morning of July 5, 2001. (Resp. Ex. 12, Vol. 2 at 322.) Dillard stated that Ms. Campbell picked her and her two children up from their home around 8:30 a.m. and they drove to pick up petitioner. (Id.) Dillard testified they then drove to either the bail bonds or paralegal which was closed so they went to eat breakfast. (Id. at 325.) They then went to the bank so that Ms. Campbell could withdrawal money for petitioner and then back to the area of the bail bonds office for petitioner to pay his bail. (Id.)

Robert Campbell, Sr., petitioner's father, testified at the evidentiary hearing that on the morning of July 5, 2001, Ms. Campbell arrived at his house around 8:30 a.m. and picked petitioner up. (Id. at 492.) Campbell Sr. stated that petitioner was gone for several hours. (Id. at 496.)

In rejecting petitioner's claim, the state court found none of the witnesses presented by petitioner to be credible. (Resp. Ex. 10 at 9.) The court noted that Ms. Campbell "fidgeted" a great deal on the stand and "regularly took long pauses before answering each question." (Id. at 6 n.4.) Additionally, the court noted that the inconsistencies between the testimony Dillard offered and her earlier declaration were "too numerous to mention" and that it was inconceivable that neither she nor petitioner's parents had come forward prior to petitioner's trial. (Id. at 9.) Thus, the state court found the testimony incredible and that the presentation of petitioner's alibi defense would not likely have affected the outcome of the trial. (Id. at 10.)

Here, petitioner has failed to show that his trial counsel fell below an objective standard of reasonableness for not investigating and presenting evidence in connection with an alibi defense. Strickland, 466 U.S. at 687-88. At the evidentiary hearing before the state court, petitioner's trial counsel testified that while Ms.Campbell was convinced of petitioner's innocence, she never mentioned a bank receipt and "flatly refused to cooperate or talk . . . about [petitioner]" during the trial. (Resp. Ex. 12, Vol. 2 at 451.) Additionally, petitioner's counsel testified that when he questioned petitioner regarding the robbery, petitioner "deflected" and told counsel to "ask my father, he'll know." (Id. at 455.) Counsel stated that he had frequent contact

with petitioner's father but was never made aware of a potential alibi.  (Id.)  The state court found petitioner's counsel "entirely credible" and that his testimony was "consistent with the observations of [the] Court regarding [Ms. Campbell's] demeanor and attitude while testifying." (Resp. Ex. 10 at 9.)

Deferring to the credibility determination of the state court, the record indicates that petitioner's counsel was not made aware of a potential alibi defense during trial.  See Weaver, 455 F.3d at 963 n.6.  Thus, trial counsel had no reasonable basis for investigating an alibi-related defense, and his failure to do so did not constitute ineffective assistance.  See Cox v. Del Papa, 542 F.3d 669, 682-83 (9th Cir. 2008) (explaining the failure to investigate a defense may not be ineffective assistance where it was due to the defendant's failure to inform the attorney of relevant facts and insistence on a particular course of action).

Moreover, petitioner has failed to show that he was prejudiced under Strickland's second prong.  While petitioner has presented a bank receipt from the day of the crime, it only shows that a withdrawal took place from Ms. Campbell's account approximately one hour after the robbery and does not show that petitioner was ever at the bank.  Additionally, petitioner's alibi witnesses were found to be entirely incredible by the state court and petitioner has not shown that a jury would find otherwise.  In light of the testimony of Johnson and Vargas, both placing petitioner at the scene of the crime, petitioner has failed to show that had his alibi witnesses testified at trial the result of the proceeding would have been different.  Thus, the state courts rejection of petitioner's claim was neither an unreasonable determination of facts, nor contrary to or an unreasonable application of clearly established federal law.

      4.     <u>False evidence</u>

Lastly, petitioner claims that James Johnson unduly influenced the jury by lying about his drinking habits.  (Pet. at 6aa.)    Petitioner alleges that Johnson's assertion that he doesn't drink too much was false testimony and but for this lie, Johnson's eye witness account of the robbery would have been disregarded by the jury.  (Id.)

Petitioner basis his claim on the following interaction between Johnson and  defense counsel during cross examination:

| | | |
|---|---|---|
| Q. | | Were you doing anything that might affect your ability to actually see what's going on in front of you on July 5th? |
| A. | | You got me lost there. |
| Q. | | What I'm saying is, you know the experience when you drink a little bit too much and things become a little bit blurry? |
| A. | | I don't drink too much. |
| Q. | | Okay. So that's not an experience that you've ever had? |
| A. | | No. |

(RT 179.)

Petitioner alleges that Johnson's previous convictions for possession of narcotics, being under the influence and petty theft of liquor show Johnson's testimony to be false. (Pet. at 6aa, RT 73.) According to petitioner, this false testimony produced a significantly different impression of Johnson's credibility for the jury in light of the fact that he was drinking at the time he witnessed the crime. (Id.)

In rejecting petitioner's claim, the state court found Johnson's eyewitness testimony to be credible. (Resp. Ex. 10 at 8.) The court emphasized that there was no evidence that Johnson was intoxicated at the time of his observations and initial statements to police. (Id..) While Johnson acknowledged that he had been drinking that day, he testified that his perception was not altered when he witnessed the robbery. (Id.)

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). Even conviction based in part on perjured testimony or false evidence, presented in good faith, does not comport with notions of fundamental fairness guaranteed by the due process clause. See Hayes v. Brown, 399 F.3d 972, 980 (9th Cir. 2005). Thus, when the government unwittingly presents perjured testimony, a reviewing court must determine whether "'there is a reasonable probability that [without all the perjury] the result of the proceeding would have been different.'" Killian v. Poole, 282 F.3d 1204, 1209 (9th Cir. 2002). Ultimately, relief will depend on whether with the perjured testimony or false evidence petitioner received a fair trial. See Kyles v.

1  Whitley, 514 U.S. 419, 434 (1995).  A violation will be found, and relief will be granted, by
2  showing that the perjured testimony or false evidence could reasonably be taken to put the whole
3  case in such a different light as to undermine confidence in the verdict.  See Kyles, 514 U.S. at
4  435.
5       Here, assuming Johnson's testimony was false as to whether he had ever experienced
6  blurred vision from the effects of alcohol,  petitioner has failed to show that this  testimony
7  significantly effected the result of his trial.  Johnson testified that he was not intoxicated at the
8  time he witnessed the incident.  (RT 179.)  The police officers who met with Johnson
9  immediately after the crime testified that there was no indication that he was drunk.  (RT 364,
10 368, 402, 408.)  The fact that Johnson may have been intoxicated at some point in his life is not
11 any indication as to his ability to identify petitioner on the day of the robbery.  Thus, regardless
12 of his allegedly false statement, the jury had a reasonable basis to find Johnson's eyewitness
13 testimony credible.
14      Furthermore, petitioner was identified by Vargas, who also placed him at the scene.  (RT
15 at 230.)  Petitioner argues that Vargas' testimony is unreliable because he was only able to
16 identify petitioner once petitioner returned to his store.  (Compl. at 6p.)  However, the state court
17 rejected petitioner's argument emphasizing that Vargas was clear and consistent in his
18 identification of petitioner.  (Resp. Ex. 10 at 8.)  The jury and the state court determined Vargas'
19 testimony to be fully credible and petitioner has presented no evidence rebutting the presumption
20 of correctness to which this determination is entitled.  28 U.S.C. § 2254(e)(1).
21      In sum, even assuming that Johnson's testimony that he had never experienced blurred
22 vision from the effects of alcohol to be false, petitioner has not shown this testimony could
23 reasonably be taken to undermine confidence in the verdict.  See Kyles, 514 U.S. at 435.  This
24 allegedly perjured statement did not deprive petitioner of a fair trail.  Therefore, the state courts
25 determination was neither an unreasonable determination of facts, nor is it contrary to or an
26 unreasonable application of clearly established federal law.
27      Petitioner also claims that his trial counsel was rendered ineffective for failing to
28 impeach Johnson's testimony in which he stated that he doesn't drink too much.  (Compl. at 6y.)

1  However, the trial judge ruled that Johnson's previous convictions were not probative as to his
2  credibility and that evidence of these convictions were inadmissible for impeachment purposes.
3  (RT 84.)  Therefore, petitioner's counsel cannot be said to have fallen below an objectively
4  reasonable standard for failing to introduce evidence the trial judge ruled barred.  Furthermore,
5  as discussed above, petitioner has not shown that the outcome of his trial was undermined by
6  Johnson's alleged false testimony.  Petitioner has not shown he was prejudiced by such
7  testimony.  Strickland, 466 U.S. at 686.  His counsel's failure to impeach Johnson was not
8  deficient nor is there a reasonable probability that the outcome of petitioner's trial would have
9  been altered if he his counsel had done so.  Therefore, the state court's rejection of petitioner's
10 claim was neither an unreasonable determination of facts, nor contrary to or an unreasonable
11 application of clearly established federal law.

**CONCLUSION**

For the reasons set forth above, the court concludes that petitioner has failed to show a violation of his federal constitutional rights in the underlying state criminal proceedings. Accordingly, the petition for writ of habeas corpus is DENIED.  The Clerk shall terminate all pending motions and close the case.

**CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners have been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

IT IS SO ORDERED.

DATED: 9/30/10

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge